# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: July 22, 2026

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| KYRA ALBANESE and MATTHEW ALBANESE, on behalf of their minor child, L.A., | * | |
| Petitioners, | * | Case No. 23-2065V |
| v. | * | Special Master Nora Beth Dorsey |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Dismissal Decision; Order to Show Cause; Hemophagocytic Lymphocytosis ("HLH"); Measles, Mumps, Rubella, and Varicella ("MMRV") Vaccine. |
| * * * * * * * * * * * * * * * | * | |

John L. DeFazio, Viola Cummings and Lindsay, LLP, Niagara Falls, NY, for Petitioner.
Elizabeth Andary, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION**[1]

## I. INTRODUCTION

On December 4, 2023, Kyra Albanese and Matthew Albanese ("Petitioners"), on behalf of their minor child, L.A., filed a petition for compensation in the National Vaccine Injury Program, 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioners allege that as the result of receiving a measles, mumps, rubella, and varicella ("MMRV") vaccine on September 18, 2020, L.A.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018) ("Vaccine Act" or "the Act"). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

developed hemophagocytic lymphohistiocytosis ("HLH"). Petition at Preamble (ECF No. 1); Amended Petition ("Am. Petition") at Preamble (ECF No. 26).[3] Respondent argued against compensation, stating that "this case is not appropriate for compensation under the terms of the Vaccine Act." Respondent's Report ("Resp. Rept.") at 2 (ECF No. 37).

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[4] the undersigned finds that Petitioners have failed to provide preponderant evidence that the MMRV vaccination caused L.A.'s illness. Thus, Petitioners have failed to satisfy their burden of proof under Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1280 (Fed. Cir. 2005). Accordingly, Petitioners are not entitled to compensation.

## II. BACKGROUND

### A. Procedural History

On December 4, 2023, Petitioners filed their petition. Petition. Petitioners filed an amended petition on June 26, 2025. Am. Petition. Between December 2023 and July 2025, Petitioners filed medical records in support of their claim. Petitioner's Exhibits ("Pet. Exs.") 1-22. The case was reassigned to the undersigned on July 21, 2025. Notice of Reassignment dated July 21, 2025 (ECF No. 32). On October 20, 2025, Respondent filed his Rule 4(c) report, arguing against compensation and requesting the amended petition be dismissed. Resp. Rept. at 2.

On November 4, 2025, the undersigned held a status conference to relay her concerns regarding the temporal association of L.A.'s vaccinations and the onset of HLH. See Order to

[3] Petitioners filed an amended petition alleging L.A. developed HLH as result of the "measles, mumps, and rubella vaccine (MMRV/Proquad) . . . received on August 4, 2017 and September 18, 2020." Am. Petition at Preamble. In the amended petition, Petitioners alleged L.A. developed pustules "[w]ithin two weeks of receiving the August 4, 2017 MMR vaccine." Id. at ¶ 5. However, in the same petition, Petitioners asserted "[p]rior to September 18, 2020, [L.A.] had no signs or symptoms of HLH." Id. at ¶ 16. Thus, Petitioners do not appear to relate L.A.'s HLH to his August 2017 MMR vaccine. Further, the Vaccine Act prohibits the filing of a petition "after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury." §16(a)(2). Here, the petition and amended petition were filed on December 4, 2023, and June 25, 2025, respectively—beyond the 36-month limitations period for any injury that allegedly occurred in August 2017.

[4] While the undersigned has reviewed all the information filed in this case, only those filings and records that are most relevant will be discussed. See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); see also Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

Show Cause dated Nov. 5, 2025, at 1 (ECF No. 38). She subsequently issued an Order to Show Cause. Id.

The undersigned advised Petitioners that the record as it stood did not appear to support vaccine causation. Order to Show Cause at 1. Relying on the medical history provided by Petitioners in their amended petition, L.A. had an onset of fever on January 5, 2021—105 days after receiving his second MMR vaccination. Id. at 2. A review of all previous HLH cases demonstrated appropriate onset timeframes for an innate or adaptive immune response after vaccination. Id. at 2-3. Onset in all prior HLH cases ranged from three to 47 days.[5] Id. Accordingly, without additional evidence to support a temporal relationship between the MMR vaccinations and the onset of L.A.'s HLH, the undersigned would be unable to find support for vaccine causation. Id. at 3. Petitioners were ordered "to show cause why this case should not be dismissed by filing evidence showing a temporal relationship between L.A.'s MMR vaccination and HLH no later than Monday, January 5, 2026." Id.

Petitioners did not file any additional evidence. Instead, in response to the Order to Show Cause, Petitioners submitted a motion for a ruling on the record. Pet. Motion for Ruling on the Record ("Pet. Mot."), filed November 18, 2025 (ECF No. 39-1). In their motion, Petitioners conceded that the undersigned's "investigation of the facts and science supporting this case as in the petition and the oral presentation of the Petitioners' counsel has demonstrated to the Petitioners that they will be unable to prevail and that they are not entitled to compensation in the Vaccine Program." Id. at 1. They further noted that "[i]n these circumstances, to proceed any further would be unreasonable." Id. Thus, Petitioners moved for a Decision by the undersigned on the current record. Id. Respondent did not file a response.

This matter is now ripe for adjudication.

### B. Relevant Medical History[6]

L.A. was born on August 1, 2016, without complication. Pet. Ex. 2 at 9. He was delivered at 38 weeks with Apgar scores of nine at both one and nine minutes, and his neonatal course was uncomplicated. Id. at 9-10.

L.A. was seen regularly by his pediatrician, often weekly, during the first twelve months of his life for well- and sick-child visits. See generally Pet. Ex. 3 at 138-216. His physical examinations were largely unremarkable, and he was consistently noted to be normal in growth and his development was progressing as expected. See id. He did, however, experience frequent routine childhood illnesses, including upper respiratory infections, viral illnesses, and ear infections. See, e.g., Pet. Ex. 3 at 146, 148, 152, 164, 167, 170, 172, 176, 177, 181, 194. He also

[5] For a review of the relevant case law, see Order to Show Cause at 2-3.

[6] This medical history is largely taken from Respondent's Rule 4(c) report as the undersigned finds the Rule 4(c) report provided an accurate representation of the records. See Resp. Rept. at 2-18. As there are extensive medical records in this case, the undersigned's summary contains only the most relevant medical history.

experienced allergic and atopic conditions, including wheezing, dermatitis, roseola, and food allergies. See, e.g., Pet. Ex. 3 at 139, 143, 156, 158, 161, 167, 189, 192, 206.

L.A. received his scheduled childhood vaccines, including Pentacel (diphtheria, tetanus, and acellular pertussis ("DTaP"), *haemophilus influenzae* B ("Hib"), inactivated poliovirus ("IPV")), pneumococcal conjugate, rotavirus, hepatitis A, hepatitis B, and influenza ("flu") vaccines, without experiencing any complications throughout the first year of life. See Pet. Ex. 1 at 1. L.A.'s pediatrician consistently noted that she addressed concerns—to the extent any were raised—regarding the vaccines administered to L.A. See, e.g., Pet. Ex. 3 at 139, 175, 186, 197.

On August 4, 2017, at L.A.'s twelve-month well-child exam, he received his first MMR vaccine. Pet. Ex. 3 at 139; see Pet. Ex. 1 at 1.

Approximately five weeks later, during a September 1, 2017 pediatric visit, L.A.'s mother reported that L.A. had developed a rash five days earlier that had since improved after changing his bathing routine. Pet. Ex. 3 at 133. She also reported that she had keratosis pilaris and L.A.'s sister had eczema. Id. The pediatrician diagnosed L.A. with atopic dermatitis and recommended discontinuing bubble baths and moisturizing frequently. Id. at 134.

On September 11, 2017, L.A. returned to the pediatrician with a rash that had started on his arms and legs and spread to his face and buttocks. Pet. Ex. 3 at 131. His physical examination revealed erythematous, non-excoriated papules on his upper arms, thighs, and face. Id. The pediatrician suspected that L.A.'s rash might be keratosis pilaris, prescribed a steroid ointment, and told his mother to take him to a dermatologist if the rash did not improve. Id. at 131-32. L.A. was subsequently evaluated by dermatology multiple times for persistent and recurring rashes. See, e.g., Pet. Ex. 4 at 1; Pet. Ex. 22 at 44-45, 49-63.

A September 2017 skin biopsy taken from his right arm showed mild superficial perivascular inflammation that was diagnostically nonspecific but thought to be consistent with viral exanthem or reactive erythema. See Pet. Ex. 4 at 1; Pet. Ex. 19 at 2. On December 29, 2017, a dermatologist noted a several-month history of a persistent, asymptomatic eruption on the face and extremities, which L.A.'s father reported began approximately two weeks after his one-year vaccinations. Pet. Ex. 16 at 1. The dermatologist described a monomorphous eruption of two to three millimeter crusted red papules symmetrically distributed on the cheeks and extremities, with some involvement of the hands but no oral lesions. Id. The working diagnosis had been Gianotti-Crosti syndrome, though the duration and appearance were considered atypical, raising the possibility of an acral form of pityriasis lichenoides. Id. A four millimeter punch biopsy from the left thigh was performed. Id. A subsequent December 2017 biopsy demonstrated necrotizing granulomatous dermatitis with inflammatory changes, suggestive of chronic varicella infection. Pet. Ex. 22 at 26.

From late 2017 through 2019, dermatological examinations consistently described crusted papules and erythematous lesions on L.A.'s face, extremities, and buttocks, with some lesions leaving atrophic or hypopigmented plaques consistent with scarring. See, e.g., Pet. Ex. 2 at 50-51, 86-88, 97-100, 118-28; Pet. Ex. 22 at 44, 49, 52, 55, 58, 61. L.A.'s treating providers documented differential diagnoses that included Gianotti Crosti syndrome, lymphomatoid

papulosis (LyP), perforating granuloma annulare, and pityriasis lichenoides et varioliformis acuta (PLEVA). Pet. Ex. 2 at 51, 88, 100, 122, 128; Pet. Ex. 22 at 44, 49, 52, 55, 58, 61.

A pediatric allergist/immunologist evaluated L.A. on January 12, 2018, for his persistent rash and for a possible underlying immunodeficiency. Pet. Ex. 2 at 48. L.A.'s parents told the allergist that they were concerned that L.A.'s rash had "initially developed [two] weeks after his 12 month vaccines on [August 4, 2017]." Id. They further reported that his rash "resolv[ed] over the ensuing [two] months" and then "worsened [two] weeks" after his "next round of vaccinations on [October 20, 2017]."[7] Id. The allergist noted L.A.'s dermatologists' initial suspicion of Gianotti Cristi syndrome, his biopsy showing "inflammation with granulomatous reaction," and that L.A. had "tolerated his vaccinations well with no overt reactions nor post vaccination illnesses nor fevers." Id. The allergist documented differential diagnoses of Gianotti Crosti syndrome, pityriasis lichenoides, and chronic granulomatous disease ("CGC"), and wrote:

> The likelihood of [L.A.'s] rash being related to vaccine strain [varicella zoster virus ("VZV")] is low, particularly based on the fact he developed the rash prior to receiving this vaccine and also given the fact that the chronicity of the rash is not in keeping with a VZV rash.

Id. at 51. The allergist planned to obtain laboratory testing for CGD and deferred to L.A.'s dermatologists regarding the management of his rash. Id. at 51-52.

Repeat punch biopsies in September 2018 and April 2019 showed a granulomatous dermatosis with necrobiosis, which L.A.'s dermatologists noted was consistent with a rare presentation of perforating granuloma annulare. See, e.g., Pet. Ex. 2 at 118, 123, 124-26, 144, 176, 183. L.A.'s dermatologists also considered a diagnosis of LyP, noting however that necrobiosis is unusual in LyP. Id. at 144, 183, 185. Meanwhile, L.A.'s laboratory testing, including immunoglobulin levels, lymphocyte subsets, neutrophil oxidative burst, complement studies, and TB-specific T-cell stimulation, was within normal limits and did not indicate evidence of an underlying immunodeficiency or chronic infection. See id. at 144; see also id. at 55-85. L.A.'s mother continued to tell his dermatologists that his "first flaring occurred after an illness or vaccination." See id. at 155.

From 2017 through 2020, pediatric and dermatology records document that L.A. remained otherwise healthy, apart from routine childhood illnesses, including croup and a persistent cough from September 2019 through February 2020, with normal growth and development. See, e.g., Pet. Ex. 3 at 81-82, 85, 88, 90, 103, 105, 109, 110, 115, 118, 120, 125. L.A. continued to receive his scheduled childhood vaccines, including DTaP, Hib, IPV, flu, hepatitis A, and varicella vaccines. Pet. Ex. 1 at 1.

During his September 18, 2020 four-year well-child visit, L.A. was noted to be generally well developed, well nourished, and in no apparent distress. Pet. Ex. 3 at 78-79. He was diagnosed with allergic rhinitis and mild intermittent asthma and administered DTaP-IPV, flu, and MMRV immunizations without complication. Id. at 80; see also Pet. Ex. 1 at 1.

---

[7] On October 20. 2017, L.A. was received Pentacel and varicella vaccinations. Pet. Ex. 1 at 1.

On November 23, 2020, L.A. had a telehealth visit with his pediatrician's office for a cough. Pet. Ex. 3 at 76. The pediatrician diagnosed acute obstructive laryngitis (croup) and recommended oral Decadron, a corticosteroid. Id.

On January 11, 2021, nearly four months after his MMRV vaccination, L.A. had another video visit with his pediatrician's office for fever. Pet. Ex. 3 at 74. His mother reported that his croup cough had gone away but that he had had a fever for "a few days."[8] Id.

The following day, on January 12, 2021, L.A.'s mother brought him to the pediatrician's office for further evaluation of his fever. Pet. Ex. 3 at 72. She reported "[four] days of fever on and off," with sweating, shaking, and a temperature of 103.5°F the night before. Id. She also reported that he had tested negative for COVID the previous day and had no known sick contacts. Id. On examination, L.A. appeared ill, and "palpation of [his] internal organs reveal[ed] significant splenomegaly and mild hepatomegaly." Id. at 73. The pediatrician diagnosed "[four] days of fever along with fatigue, pallor and hepatosplenomegaly" and advised L.A.'s mother to take him to the emergency department ("ED") for further workup. Id.

Later that day, L.A. presented to the University of Rochester ED following referral from his pediatrician for five days of fever and hepatosplenomegaly. Pet. Ex. 2 at 208. His family also reported a croupy cough, increasing pallor, fatigue, and sweating. Id. at 209. On examination, L.A. appeared ill and tired, with conjunctival pallor, pale skin, and abdominal distension due to hepatosplenomegaly. Id. at 211-12. The plan was to obtain blood work and an abdominal ultrasound and admit L.A. to the pediatric hematology/oncology service. Id. at 212-13.

Initial laboratory testing revealed mildly elevated C-reactive protein and pancytopenia. Pet. Ex. 2 at 246; see id. at 216-30. An abdominal ultrasound showed hepatosplenomegaly, while chest X-ray findings were nonspecific, interpreted as showing either a possible viral infection or reactive airways. Id. at 234-37. L.A. received a red blood cell transfusion in the ED due to markedly low hemoglobin and hematocrit. Id. at 213.

L.A. was admitted to the pediatric hematology/oncology service that evening. Pet. Ex. 2 at 247. Pediatric hematology/oncology resident Ryan Carrier, M.D., recorded the following history:

> [L.A.] is a [four year old] male with [a past medical history] of granulomatous dermatosis who presents with [four to five] days of fever and hepatosplenomegaly found by PCP. He was in his usual state of health until Friday evening/Saturday morning when he developed a fever associated with croupy cough that resolved after one day. The fevers persisted daily, worst in the evening with [maximum temperature of] 104 [Fahrenheit]. They have been alternating tylenol and ibuprofen to treat fevers at home. He has associated sweats and chills with fevers,

[8] In the amended petition, Petitioners stated L.A.'s fever began January 5, 2021. Am. Petition at ¶ 7.

> soaking through his clothing. He has been fatigued and generally weak with good [food] intake until this afternoon. Normal urine output. No nosebleeds, swollen glands/lymph nodes, sick contacts at home. They brought him to the PCP today for evaluation and was noted to have hepatosplenomegaly and was prompted to present to the ED. Of note, he received MMR vaccine a few weeks ago and family is worried about a connection to this dose and his current symptoms. He had a severe rash a few weeks after his first dose of MMR with extensive dermatologic evaluation and no clear etiology identified.

Id. at 248. Dr. Carrier and his attending physician Angela Girvin, M.D.'s differential diagnoses included leukemia, anemia, blood dyscrasia, malignancy, and viral or bacterial infection. Id. at 250-51. They started L.A. on Cefepime, an IV antibiotic, and ordered a second blood transfusion and a bone marrow biopsy for the following day. Id. at 251.

L.A. underwent extensive subspecialty evaluation during his hospital admission. The hematology/oncology team considered leukemia, aplastic anemia, and viral bone marrow suppression; he received two red blood cell transfusions. See Pet. Ex. 2 at 213, 238-39, 247-51. A bone marrow aspirate and biopsy demonstrated no malignancy, normal cellularity, and normal hematopoietic lineages, essentially ruling out leukemia and aplastic anemia. Id. at 264, 268-70. Chromosomal analysis showed a normal karyotype. Id. at 272.

Allergist/Immunologist Jennfier Pier, M.D., evaluated L.A. on January 17, 2021. Pet. Ex. 2 at 263. Dr. Pier considered several different diagnoses, including HLH, autoimmune lymphoproliferative syndrome ("ALPS"), and immunodeficiency disorders due to L.A.'s fever, pancytopenia, hepatosplenomegaly, and dermatologic history. See id. Dr. Pier specifically noted that L.A.'s "splenomegaly with cytopenia, elevated ferritin (which can also be seen in the setting of infections)[,] and hypertriglyceridemia" raised concern for HLH. Id. To further evaluate HLH, she recommended obtaining soluble IL-2 (CD 25) and checking his bone marrow biopsy for hemophagocytosis. Id.

Further laboratory evaluation—including immunoglobulins, lymphocyte subsets, complement studies, EBV PCR, CMV serologies, parvovirus PCR, and IL-2 receptor levels—was within normal limits or unremarkable, except for elevated ferritin. Pet. Ex. 2 at 55-85, 273-76, 279-88. Infectious disease consultants considered possible viral etiologies including cytomegalovirus ("CMV"), Epstein-Bar virus ("EBV"), COVID-19, enterovirus, parvovirus, human immunodeficiency virus ("HIV"), and hepatitis, though studies were negative. Id. at 256.

L.A. was discharged from the hospital on January 18, 2021, with diagnoses of pancytopenia and fever and instructions to follow up with hematology/oncology in one week. Pet. Ex. 2 at 238-40.

On January 22, 2021, L.A. followed up with hematology and had lab work done. Pet. Ex. 2 at 503-07. On examination, L.A. had mild pallor and appreciable splenomegaly, though he otherwise appeared well. Id. at 504, 506. Labs showed improving white blood cells and platelets, a slight drop in ANC and hemoglobin, and decreasing ferritin. Id. at 506.

During a follow-up visit with hematology one week later, on January 28, 2021, L.A. was noted to be doing "remarkably well." Pet. Ex. 2 at 518. The hematologist planned to send L.A.'s most recent blood work to Cincinnati Children's Hospital for immunological testing to "check for primary immunodeficiencies and HLH syndromes." Id. at 521.

On January 30, 2021, L.A. presented to the University of Rochester's ED with decreased appetite and a fever of 102.8°F since the previous night. Pet. Ex. 2 at 529. On examination, the attending ED physician noted splenomegaly. Id. His CBC showed leukopenia, neutropenia, anemia, and thrombocytopenia. Id. at 533. He was administered IV antibiotics for fever and neutropenia and readmitted to the hematology/oncology service, where he remained until February 11, 2021. Id.

Over the first days of his admission, L.A.'s labs revealed elevated ferritin, elevated triglycerides, and markedly elevated soluble IL-2R. See Pet. Ex. 2 at 584-630. His hematologists observed features indicative of HLH, including fever, splenomegaly, cytopenia, and lab abnormalities, and recommended further genetic testing to confirm HLH. Id. at 562.

Immunologist Jessica Stern, M.D., M.S., assessed L.A. on January 31, 2021, and determined that his presentation suggested immune dysregulation of an unclear etiology. Pet. Ex. 2 at 567-68. She considered HLH but noted that patients with HLH usually appear sicker and that L.A.'s bone marrow did not show hemophagocytosis. Id. at 568. Nevertheless, she noted that "it is possible to have HLH and negative bone marrow biopsy, especially early in the course of illness." Id. She also agreed that genetic testing for HLH- and ALPS-associated variants was warranted. Id.

Rheumatologist Bethany Marston, M.D., evaluated L.A. on February 2, 2021, and raised concern for HLH/macrophage activation syndrome ("MAS") spectrum disease. Pet. Ex. 2 at 570 71. She explained that HLH/MAS can appear as a primary (genetic) condition or secondary to another disorder. Id. at 576-77. Dr. Marston noted that L.A. had received an MMR booster in "October 2020" and "did well for a couple of months after that." Id. at 571. She documented that L.A.'s father was "convinced in retrospect" that L.A.'s MMR booster in 2020 "was what initiated the current stream of events, likely triggered or exacerbated by a virus." Id. at 571.

On February 4, 2021, L.A.'s hematology team discussed his case with colleagues in Boston and Cincinnati. Pet. Ex. 2 at 707; see id. at 700-06. They concluded that his course aligned with HLH/MAS spectrum disease, though not fulminant HLH, and raised concern for underlying immune dysregulation that put him at risk for HLH. See id. at 707. They initiated treatment with anakinra, an interleukin-1 ("IL-1") receptor antagonist, while awaiting genetic testing results, with a plan to escalate to steroids or etoposide if his condition worsened. Id.

By February 11, 2021, L.A. remained neutropenic but afebrile, with improvement in ferritin and partial recovery of his blood counts. Pet. Ex. 2 at 738. He received a red blood cell transfusion and was discharged home with instructions to follow up with hematology/oncology. Id. at 674-76, 738.

On February 19, 2021, L.A. was readmitted to the University of Rochester with recurrent fever, worsening blood counts, abnormal liver function tests, and a transient facial rash. Pet. Ex. 2 at 985-86. His examination showed hepatosplenomegaly with a distended abdomen. Id. at 989. The working diagnosis was HLH, and the hematology/oncology team planned additional lab testing and monitoring. See id. at 990. An abdominal ultrasound showed an enlarged spleen and an enlarged, abnormal-looking liver, with changes that were interpreted as possibly reflecting a disease process spreading throughout the liver tissue. See id. at 975.

L.A. remained hospitalized for one week, until February 26, 2021. During this third hospitalization, L.A.'s ferritin levels remained elevated, though by February 24, 2021, his fever resolved and ferritin levels declined. Pet. Ex. 2 at 982. He underwent a bone marrow biopsy, which showed dysplasia (abnormal blood cell development) and a small percentage of blasts (immature cells), but no leukemia mutations. See id. at 1042-43. He also underwent a liver biopsy, which demonstrated inflammation, non-necrotizing granulomas, and early fibrosis (scarring). Id. at 1041-42. L.A.'s lab results were largely normal, including immune function tests; there was a mild decrease in one type of immune cell, CD8 T cells, but no evidence of MAS. Pet. Ex. 2 at 982, 1017, 1163. L.A.'s vaccine titers were robust, showing protective levels for tetanus and >1.3 for 6 of 13 pneumococcal antigens. Id. at 982.

Immunologist Katherine Tuttle, M.D., considered HLH the most likely diagnosis, though it remained unclear whether it was primary or secondary. Pet. Ex. 2 at 1019. She agreed with the assessment of allergy and immunology fellow, Cheryl P. Rozario, M.D., who noted: "The exact etiology of HLH is unclear, possibly atypical presentation of primary (Cincinnati genetic testing pending) vs. secondary (i.e. malignancy, less likely infectious/viral given negative work up thus far)." Id. at 1018. Addressing potential secondary causes, Dr. Tuttle explained:

> a malignancy may explain his overall clinical picture and can be seen in HLH clinical syndromes . . . . His liver [ultrasound] concerning for infiltrative process, and liver biopsy and a second [bone marrow biopsy] are planned for further investigation. In discussion with Hematology-Oncology colleagues[,] a primary liver lymphoma is incredibly rare in pediatric patients. A rheumatologic cause has not been identified, and frankly, his CXCL9 and IL-18 levels, while elevated, are not as elevated as typically seen in macrophage activation syndrome. Of note, which I do believe may be related, [L.A] has had a prior granulomatous dermatitis, triggered by live vaccines (negative DHR in past). Infectious causes, classically [human herpesvirus 6], EBV, CMV, are undetected. COVID PCR/serologies negative. More unusual causes, such as Ehrlichia/Histoplasmosis are investigated, without evidence of infection. Thinking even more broadly, ALPS (which can be an HLH 'mimicker') is lower on differential (less likely given normal vit[amin] B12) and soluble FasL helpful in this determination, but he does not meet criteria for ALPS at this diagnostic juncture.

Id. L.A.'s hematology team likewise concluded that he met HLH diagnostic criteria but elected not to initiate HLH-directed or immunomodulatory therapy given his clinical stability. See id. at 1173, 1200.

During his hospitalization, L.A. received multiple transfusions, including red blood cells, platelets, and cryoprecipitate. Pet. Ex. 2 at 982, 1191, 1193. On February 24, 2021, Dr. Tuttle reiterated HLH as her leading diagnosis but noted several atypical features. Id. at 1200-01. She outlined malignancy, infection, immunodeficiency, and autoinflammatory disorders as possible alternatives, and supported L.A.'s family's desire to have him transferred to Cincinnati Children's Hospital for further evaluation. Id. at 1199, 1201. Her plan included repeating inflammatory and immune testing, expediting genetic analysis at Cincinnati, and forwarding the transfer summary. See id. at 1201.

After his third hospitalization at the University of Rochester Medical Center, L.A. was admitted to Cincinnati Children's Hospital on February 26, 2021, for further evaluation of his recurring fevers, hepatosplenomegaly, and pancytopenia. Pet. Ex. 5 at 90-95. Upon admission, he was feeling well and afebrile. Id. at 90, 92-93. His father reported that "symptoms started in early January 2021 with a viral prodrome, followed by fevers." Id. at 90. Addressing L.A.'s previous history of granuloma annulare, his father reported that L.A. "developed 'chickenpox-like lesions' all over his body following his first two MMR doses - lesions persisted for months before scabbing over and healing; eventually diagnosed with granuloma annulare by a dermatologist, though not biopsy proven. [L.A.] received final MMR dose in September 2020." Id. Bone marrow transplant hospitalist Mfon Valencia Umoren, M.D., noted that no overt manifestations were reported following the September 2020 vaccination. Id. However, she noted L.A.'s father questioned whether the "presentation [might be] been linked to" his final MMR dose in September 2020. Id.

After reviewing the record and examining L.A., Dr. Umoren documented: "[f]our-year-old male with cyclic fevers, hepatosplenomegaly, and pancytopenia over the past 6 weeks; workup negative so far for malignancy [or] infection; indeterminate for HLH and genetic workup unrevealing so far. Transferred from outside hospital for further evaluation." Pet. Ex. 5 at 93. Dr. Umoren recommended daily lab monitoring, prophylactic antimicrobials, supportive care with IV fluids and nutrition monitoring, and continued evaluation for HLH through genetic testing, imaging, and bone marrow/liver biopsy review. See id. at 93-94.

On March 9, 2021, genetic testing confirmed familial HLH, identifying one pathogenic and one likely pathogenic UNC variant, as well as additional variants of uncertain significance. Pet. Ex. 14 at 624-29. The interpreting pediatric immunologist noted that familial and secondary HLH are clinically indistinguishable and often infection-triggered. Id. at 624-25. Bone marrow and liver biopsies were also consistent with HLH. See id. at 95.

By mid-April 2021, L.A.'s hematology/oncology team began discussing bone marrow transplant ("BMT") with the family, initiating pre-transplant evaluation and consent planning. Pet. Ex. 5 at 532–33, 564, 700; see also Pet. Ex. 6 at 303-05.

L.A. was discharged on April 17, 2021, with follow-up scheduled in the hematology/oncology clinic on April 19, 2021. Pet. Ex. 5 at 97. His discharge note documented L.A.'s "history of granuloma annulare temporally related to MMR vaccine" and noted he had been "transferred from University of Rochester Medical Center for further evaluation of

hepatosplenomegaly, pancytopenia and recurrent fevers since early January 2021." Id. at 96. His discharge condition was "healthy" and "afebrile." Id. at 97.

L.A. was readmitted to Cincinnati Children's Hospital on April 28, 2021, for BMT following his recent diagnosis of familial HLH associated with biallelic MUNC variants. Pet. Ex. 8 at 778. He received donor marrow cells on May 14, 2021, without complications. Id.; see Pet. Ex. 9 at 134-35. His post-transplant immunosuppression regimen included cyclosporine (to prevent rejection and graft versus host disease ("GVHD")) and a 35-day course of mycophenolate mofetil (to further suppress immune activity and support engraftment). Pet. Ex. 8 at 813. Around day 40, he developed a generalized maculopapular rash consistent with GVHD, which was treated with topical, oral, and intravenous steroids. Id. L.A. remained hospitalized until June 29, 2021, and was discharged with instructions for close outpatient follow-up through the hematology/oncology and bone marrow transplant teams. Pet. Ex. 8 at 813, 818-19.

Following discharge on June 29, 2021, L.A. remained under close transplant and hematology/oncology follow-up at both Cincinnati Children's Hospital and the University of Rochester. See, e.g., Pet. Ex. 2 at 1467-73, 1594-99, 1682-88, 1689-99; Pet. Ex. 13 at 371-75; Pet. Ex. 14 at 30-33, 58-61, 299-302. By April 2022, his University of Rochester hematologist noted that he was thriving and off all immunosuppression. Pet. Ex. 2 at 1699.

## III. DISCUSSION

### A. Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioners' burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010).

To receive compensation through the Program, Petitioners must prove either (1) that L.A. suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that he received, or (2) that L.A. suffered an injury that was actually caused by a vaccination. See §§ 11(c)(1), 13(a)(1)(A); Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1319-20 (Fed. Cir. 2006). Petitioners must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)).

Because Petitioners does not allege L.A. suffered a Table Injury, they must prove a vaccine he received actually caused L.A.'s injury. To do so, Petitioners must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen, 418 F.3d at 1278.

The causation theory must relate to the injury alleged. Thus, Petitioners must provide a reputable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." Knudsen v. Sec'y of Health & Hum. Servs., 35 F.3d. 543, 548-49 (Fed. Cir. 1994). Petitioners cannot establish entitlement to compensation based solely on assertions. Rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether Petitioners are entitled to compensation, the special master shall consider all material contained in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding ... causation." § 13(b)(1)(A).

**B. Analysis**

Under Althen prong one, Petitioners must set forth a medical theory explaining how L.A's vaccines could have caused his alleged injuries. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1375 (Fed. Cir. 2009); Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355-56 (Fed. Cir. 2006). Petitioners' theory of causation must be informed by a "sound and reliable medical or scientific explanation." Knudsen, 35 F.3d at 548; see also Veryzer v. Sec'y of Health & Human Servs., 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable").

Here, Petitioners did not offer any expert medical opinion or report in support of their claims. Further, L.A.'s medical records do not include any statement that could be interpreted as a medical theory as to how the MMRV vaccine could cause HLH, and L.A.'s treating physicians did not offer any opinions as to a medical theory to explain how the MMRV vaccines could cause HLH. Therefore, the undersigned finds Petitioners failed to provide preponderant evidence to support Althen prong one.

Under Althen prong two, Petitioners must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the vaccinee's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen,

418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence since they are created contemporaneously with the treatment of the vaccinee. Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). While the medical records and opinions of treating physicians must be considered, they are not binding on the special master. § 13(b)(1)(B) (specifically stating that the "diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court").

Since there is no evidence of a theory of causation to support Althen prong one, it follows that there is also no evidence to support a finding of a logical sequence of cause and effect to establish that the vaccine caused L.A.'s injuries in this case. Although L.A.'s physicians may have noted the fact that he received vaccines and may have noted Petitioners' concerns that L.A.'s HLH symptoms may have been related to his September 18, 2020 MMRV vaccine, there is not preponderant evidence to support a logical sequence of cause and effect between the September 18, 2020 MMRV and L.A.'s HLH.

The undersigned acknowledges that a treating immunologist, Dr. Tuttle, suggested that L.A.'s "prior granulomatous dermatitis [was] triggered by live vaccines" and that this "may be related" to his HLH. Pet. Ex. 2 at 1019. However, she notes that Dr. Tuttle identified several secondary causes including malignancy or a rheumatological cause. Id. Additionally, at this visit, Dr. Tuttle agreed that the "exact etiology of HLH is unclear, possibly atypical presentation of primary (Cincinnati genetic testing pending) vs. secondary (i.e. malignancy, less likely infectious/viral given negative work up thus far)." Id. at 1018. Further, Dr. Tuttle's statement was made prior to L.A.'s genetic testing, which confirmed a diagnosis of familial HLH. Thus, the undersigned finds that Dr. Tuttle's statement provides little support for Althen prong two

Later medical records note a "history of granuloma annulare temporally related to MMR vaccine" but do not relate this history of granuloma to L.A.'s HLH. See Pet. Ex. 5 at 96. While the medical records consistently note L.A.'s history of granulomatous dermatosis, the records not relate this history to granulomatous dermatosis to the onset of HLH. Instead, the onset of L.A.'s HLH symptoms (such as recurrent fevers and hepatosplenomegaly) is consistently documented as mid-January 2021. See, e.g., Pet. Ex. 3 at 73; Pet. Ex. 2 at 248; Pet. Ex. 5 at 90, 96.

The undersigned makes no findings as to whether L.A.'s August 4, 2017 MMR vaccine was related to the onset of granulomatous dermatosis approximately two weeks later.[9] However, she finds little support linking granulomatous dermatosis to L.A.'s later diagnosis of HLH. Accordingly, statements by Petitioner's treating physicians regarding a temporal association between vaccines and granulomatous dermatosis do not provide support for HLH as a vaccine-induced injury. Thus, the undersigned finds that Petitioners failed to prove Althen prong two.

Under Althen prong three, Petitioners must provide "preponderant proof that the onset of symptoms occurred within a time frame for which, given the understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." De Bazan v. Sec'y of Health &

---

[9] The undersigned notes that to the extent that Petitioners allege granulomatous dermatosis as a distinct injury following the August 4, 2017 MMR vaccine, that claim would be untimely under the Vaccine Act. See supra note 3.

Human Servs., 539 F.3d 1347, 1352 (Fed. Cir. 2008). The acceptable temporal association will vary according to the medical theory advanced in the case. See Pafford, 451 F.3d at 1358. A temporal relationship between a vaccine and an injury, standing alone, does not constitute preponderant evidence of vaccine causation. See, e.g., Veryzer, 100 Fed. Cl. at 356 (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting the vaccine and injury").

As discussed above, the medical records place the onset of L.A.'s HLH symptoms to January 2021. Petitioners report that L.A. had a fever beginning on January 5, 2021. Am. Petition at ¶ 7. On January 11, 2021, Petitioners reported to L.A.'s pediatrician that he had had a fever for "a few days." Pet. Ex. 3 at 74. The next day, on January 12, 2021, L.A.'s mother brought him to the pediatrician's office for further evaluation of his fever. Pet. Ex. 3 at 72. She reported "[four] days of fever on and off," with sweating, shaking, and a temperature of 103.5°F the night before. Id. L.A. was diagnosed with "[four] days of fever along with fatigue, pallor and hepatosplenomegaly." Id. The most contemporaneous medical records place onset of fever and hepatosplenomegaly as January 8, 2021. The undersigned finds these symptoms (fever along with hepatosplenomegaly) to be the first manifestation of his HLH.

Accordingly, the undersigned finds there is preponderant evidence that the onset of L.A.'s HLH was approximately January 8, 2021—112 days after his MMRV vaccination administered on September 18, 2020.

Petitioners have failed to provide any evidence showing the time frame between L.A.'s MMRV vaccination and the onset of his symptoms 112 days later is medically appropriate to support vaccine causation. There is no statement or opinion in the record suggesting that the time frame between vaccination and L.A.'s symptoms was medically appropriate to infer vaccine causation.

Further, a review of all prior HLH cases demonstrates appropriate onset timeframes for an innate or adaptive immune response after vaccination. Onset in these cases ranges from three to 47 days. See Hart v. Sec'y of Health & Hum. Servs., No. 01-357, slip op. at 12 (Fed. Cl. Spec. Mstr. Jul. 26, 2004) (ten-day onset); Ackley v. Sec'y of Health & Hum. Servs., No. 98-122V, 2002 WL 985435 (Fed. Cl. Spec. Mstr. Apr. 29, 2002) (seven-day onset); Sajbel v. Sec'y of Health & Hum. Servs., No. 14-741V, 2017 WL 1491912 (Fed. Cl. Spec. Mstr. Mar. 31, 2017) (three-day onset); Paz v. Sec'y of Health & Hum. Servs., No. 14-290V, 2015 WL 4557119 (Fed. Cl. Spec. Mstr. June 23, 2015) (47-day onset but dismissed on other grounds). Gall v. Sec'y of Health & Hum. Servs., No. 91-1642V, 1999 WL 1179611 (Fed. Cl. Spec. Mstr. Oct. 31, 1999) (seven-day onset).

These cases demonstrate the appropriate timeframe for an immune response relative to HLH. An innate immune response typically occurs very quickly while an adaptive immune response typically occurs within three to 42 days. There are cases in the Vaccine Program where longer onset of up to eight weeks have been found to be appropriate. However, there is no mechanistic theory that the undersigned is aware of that supports an onset of 105 days, the date between L.A.'s September 18, 2020 vaccination and onset of fever, or 112 days, representing the

date between vaccination and the onset of HLH symptoms. Accordingly, L.A.'s HLH onset is too remote to be temporally associated with his September 18, 2020 MMRV vaccination.

Therefore, the undersigned finds that Petitioners failed to provide proof of Althen prong three.

## IV. CONCLUSION

The undersigned extends her sympathy to L.A. and Petitioners for all that they and their family have suffered. The undersigned's Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

For the reasons discussed above, the undersigned finds that Petitioners have failed to provide preponderant evidence of causation, and therefore, the Petition must be dismissed. In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master